UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LEAH WHITE, et al.,<br><br>            Plaintiffs,<br><br>    v.<br><br>PAYPAL HOLDINGS INC, et al.,<br><br>            Defendants. | Case No.  25-cv-04884-PCP<br><br>**ORDER GRANTING IN PART AND DENYING IN PART MOTION TO COMPEL ARBITRATION**<br><br>Re: Dkt. No. 41, 51 |

Defendants PayPal Holdings, Inc. and The Honey Science Corporation move to compel arbitration of consumer protection claims alleged by twelve plaintiffs on behalf of a putative nationwide class. For the reasons below, the Court grants in part and denies in part the motion.

## BACKGROUND

Honey is a free browser extension developed by The Honey Science Corporation that finds and applies promotional codes for online purchases and provides rewards for qualifying purchases. Dkt. 41-1, Declaration of Owen Sperling in Support of Defendants' Motion to Compel Arbitration ("Sperling Decl.") ¶ 4. PayPal acquired Honey in 2020.

Plaintiffs each allege that they "used the Honey browser extension to find discount codes for [their] online purchases and/or to earn rewards through." Dkt. 40 ¶¶ 13–24. At various times, Honey gave users the option to create an account via the user's email, Google, PayPal, Facebook, and/or Apple account. The year that each plaintiff began using Honey and the method by which they signed up for Honey are as follows:

| Plaintiff | Sign-up Year | Sign-up Method |
|---|---|---|
| 1.  Abigail Roskind | 2015 | Google |
| 2.  Michael Amenti | 2016 | Email |
| 3.  Jordan Leturgez | 2017 | Email |

| Plaintiff | Sign-up Year | Sign-up Method |
|---|---|---|
| 4.  Leah White | 2019 | |
| 5.  Lily Fitzgerald | 2019 | Google |
| 6.  Ian Crowley | 2019 | PayPal |
| 7.  Annabelle Cruz | 2020 | Google |
| 8.  Caleb Brackney | 2021 | Email |
| 9.  Annabelle Regan | 2022 | Google |
| 10. Antonio Minichiello | 2023 | |
| 11. Alicia Freeman | 2023 | Email |
| 12. Nicholas McDonald | 2024 | PayPal |

Plaintiffs allege that Honey "misrepresents its ability to find the 'best discount codes' for consumers" and instead "prioritizes coupon codes from Honey's partner merchants," giving users "inferior discounts, or no discounts at all, while Honey and its merchant partners profit." Dkt. 40 ¶¶ 34, 36–37. Plaintiffs bring claims for unjust enrichment and violations of state consumer protection laws on behalf of a putative nationwide class of persons "who downloaded the Honey browser extension onto their browsers and used the Honey browser extension when completing an online purchase." *Id.* ¶ 73.

Defendants move to compel arbitration of each named plaintiff's claims. They contend that plaintiffs agreed to Honey's terms of service, which included an agreement to arbitrate, when signing up for a Honey account.

## LEGAL STANDARD

The Federal Arbitration Act (FAA) provides that a "written provision in … a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction … shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. A party may petition a federal court to compel arbitration, which the court "shall" order under the terms of the agreement "upon being satisfied that the making of the agreement for arbitration or the failure to comply therewith is not in issue." 9 U.S.C. § 4.

Under the FAA, courts resolve disputes over whether parties formed a contract with an agreement to arbitrate in the first instance. *Granite Rock Co. v. Int'l Brotherhood of Teamsters et al.*, 561 U.S. 287, 296 (2010). Like any other contract, an arbitration agreement must be valid and

enforceable and is subject to "generally applicable contract defenses" like "fraud, duress, or unconscionability." *Lim v. TForce Logs., LLC*, 8 F.4th 992, 999 (9th Cir. 2021); *Bielski v. Coinbase, Inc.*, 87 F.4th 1003, 1009 (9th Cir. 2023). If a contract was formed, courts typically determine two "gateway" arbitrability issues in deciding whether to compel arbitration: first, whether the agreement to arbitrate between the parties is valid and enforceable; and second, whether the dispute is covered by the agreement. *Brennan v. Opus Bank*, 796 F.3d 1125, 1130 (9th Cir. 2015). But parties to an agreement can delegate these gateway questions to an arbitrator if they clearly and unmistakably evidence their intent to do so. *Id.*; *Rent-A-Center, West, Inc. v. Jackson*, 561 U.S. 63, 70 (2010).

The "party seeking to compel arbitration[] must prove by a preponderance of the evidence that the parties formed an agreement to arbitrate." *Reichert v. Rapid Invs., Inc.*, 56 F.4th 1220, 1227 (9th Cir. 2022). The "party resisting arbitration bears the burden of proving that the claims at issue are unsuitable for arbitration" under the same standards applicable to summary judgment. *Green Tree Fin. Corp. v. Randolph*, 531 U.S. 79, 91 (2000); *Hansen v. LMB Mortg. Servs., Inc.*, 1 F.4th 667, 670 (9th Cir. 2021). Court must "give to the opposing party the benefit of all reasonable doubts and inferences." *Sanford v. MemberWorks, Inc.*, 483 F.3d 956, 963 (9th Cir. 2007). "[I]f a court 'concludes that there are genuine disputes of material fact as to whether the parties formed an arbitration agreement, the court must proceed without delay to a trial on arbitrability and hold any motion to compel arbitration in abeyance until the factual issues have been resolved.'" *Knapke v. PeopleConnect, Inc.*, 38 F.4th 824, 831 (9th Cir. 2022) (quoting *Hansen*, 1 F.4th at 672).

## ANALYSIS

"In determining whether the parties have agreed to arbitrate a particular dispute, federal courts apply state-law principles of contract formation." *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022). "To form a contract under California … law, there must be actual or constructive notice of the agreement and the parties must manifest mutual assent" in writing, orally, or through conduct. *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir.

2025).[1] "[T]he conduct of a party is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Berman*, 30 F.4th at 855.

In the online context, "if a website offers contractual terms to those who use the site, and a user engages in conduct that manifests her acceptance of those terms, an enforceable agreement can be formed." *Id.* at 856. "Unless the website operator can show that a consumer has actual knowledge of the agreement, an enforceable contract will be found based on an inquiry notice theory only if: (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* This test applies equally to clickwrap and sign-in wrap agreements. *Chabolla*, 129 F.4th at 1154–55. In a clickwrap agreement, "a website presents users with specified contractual terms on a pop-up screen and users must check a box explicitly stating 'I agree' in order to proceed." *Berman*, 30 F.4th at 856. In a sign-in wrap agreement, a user is "notified of the existence of the website's terms of use and advise[d] that by making some type of affirmative act, often by clicking a button, she is agreeing to the terms of service." *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 923 (N.D. Cal. 2024) (citation omitted).

For notice to be reasonably conspicuous, it "must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it." *Berman*, 30 F.4th at 856. Courts also consider text placement and the overall screen design to determine conspicuousness. *Chabolla*, 129 F.4th at 1154. Hyperlinks that disclose terms and conditions must be "readily apparent" to put the "reasonably prudent Internet user … on notice of their existence." *Berman*, 30 F.4th at 857. In addition to the visual aspects of the notice that courts must evaluate, "the context of the transaction is a non-dispositive factor under California law." *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019 (9th Cir. 2024). Where the nature of the transaction or agreement anticipates "some sort of continuing relationship … that would

---

[1] The parties agree that California law governs.

require some terms and conditions," a "user should expect that certain relationships are bound by terms, even if not explicitly told." *Chabolla*, 129 F.4th at 1155 (citations omitted). "Conversely, when a user simply purchases goods or avails herself of a one-time discount offer, there is less reason for her to expect a continued relationship beyond the purchase." *Id.*

An online user unambiguously manifests assent to terms "only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857. "[T]he notice must explicitly notify a user of the legal significance of the action she must take to enter into a contractual agreement." *Id.* at 858.

## I.    Defendants' evidence is insufficient to show that the plaintiffs who signed up for Honey in 2015, 2019, 2021 and 2022, entered into a contract.

Defendants fail to meet their evidentiary burden to establish that certain plaintiffs entered into a contract that compels arbitration. The only evidence before the Court is defendants' declaration, but its evidence regarding what plaintiffs who signed up for Honey in 2015, 2019, 2021, and 2022 saw on Honey's sign-up page is inadequate to show that these plaintiffs formed a contract with Honey.

Plaintiffs allege that Roskind signed up for Honey in 2015 via Google. Although a footnote in defendants' motion states that the "Wayback Machine does not display registration by Google as an option until 2019," defendants offer no evidence in support of this contention. *See United States v. Zermeno*, 66 F.3d 1058, 1062 (9th Cir. 1995). Defendants' declaration does not provide any affirmative attestation or screenshot as to what the Honey sign-up page said or looked like in 2015, or the methods through which users could sign up at that time. Nor do defendants attest to an alternate method through which Roskind might have signed up. As a result, defendants fail to establish that Roskind was given notice of any contractual terms at all when registering for Honey in 2015, let alone that Roskind manifested assent to those terms.

Plaintiffs White, Fitzgerald, and Crowley allegedly signed up for Honey in 2019 via Google, PayPal, or an unknown method.[2] Although defendants declare that users could only sign

---

[2] Plaintiffs allege that White "utilized the Honey browser extension" but not that she created an

United States District Court
Northern District of California

up for Honey via email, Google, or Facebook in 2019, the point is immaterial because defendants' declaration only provides a screenshot from the Wayback Machine showing the sign-up flow for email. Sperling Decl. ¶ 6, Figure 2. Plaintiffs do not allege, and defendants do not provide evidence of, any plaintiff registering for Honey via email in 2019.

Specifically, defendants declare that the "sign up flow reflected on the Wayback Machine for 2019 shows that, in order to create an account *by email*, potential users are required to click a 'Join with Email' button. Directly underneath that button is one line of text stating 'By joining, I agree to Honey's TOS & Privacy Policy.'" *Id.* ¶ 6 (emphasis added). Separate from this flow, the screenshot for the 2019 sign up page shows two buttons at the top of the page to "Join Honey with" Google or Facebook. Defendants offer no evidence as to what users were shown if they clicked either of those buttons. Because none of the 2019 plaintiffs purportedly registered for Honey via email, defendants fail to present any evidence as to what these plaintiffs saw when signing up for Honey.

Plaintiffs allege that Brackney and Regan signed up for Honey in 2021 and 2022 via Google and email. Defendants' declaration provides a screenshot from the Wayback Machine of the sign-up flow that a user would have seen during this period. *Id.* ¶ 9. The screenshot only shows five boxes with options for how users would like to join Honey—e.g., "Join with Google" or "Join with Email." *Id.* ¶ 9, Figure 4. The screenshot does not show any language notifying users about terms of service or show what users would have seen after selecting the button for how they would like to join. Defendants' declaration concedes that the Wayback Machine does not show what the subsequent screens would have shown users, but states that "PayPal's engineering team confirmed the check box" present on the website for an earlier sign-up flow in 2020 "was present on the website sign up flow between February 2021 and 2022." *Id.* ¶ 10.

This proffer is insufficient. First, neither plaintiffs nor defendants say whether Brackney and Regan signed up for Honey "between *February* 2021 and 2022." Second, as explained above,

---

account. Although defendants present evidence that "PayPal's records indicate that Plaintiff Leah White created a Honey account on July 3, 2019," they do not identify the method by which she did so. Sperling Decl. ¶ 25.

United States District Court
Northern District of California

the Court must assess the visual appearance of a website to determine whether it "provides reasonably conspicuous notice of the terms to which the consumer will be bound." *See Berman*, 30 F.4th at 856. The Court cannot consider whether notice of any terms was reasonably conspicuous, let alone legible, without knowing what the website looked like. Defendants thus fail to meet their burden to produce competent evidence that Brackney and Regan received notice (whether reasonably conspicuous or otherwise) of any contract terms and agreed to those terms in 2021 and 2022.

In contrast, defendants' declaration provides sufficient evidence as to what all but one remaining plaintiff saw when signing up for Honey in 2016–2018, 2020, and 2023–2024. Amenti and Leturgez, who signed up for Honey between 2016 and 2018, allegedly did so via email. Defendants provide a screenshot from the Wayback Machine showing the registration page to sign up via email during this period. Sperling Decl. ¶¶ 5, Figure 1. Cruz, who signed up for Honey in 2020, allegedly did so via Google, and defendants' declaration provides a screenshot from the Wayback Machine showing the registration page to sign up via any method, including Google, in 2020. *Id.* ¶ 8, Figure 3. Two of the plaintiffs who signed up in 2023 and 2024—Freeman and McDonald—allegedly did so via email and PayPal. Defendants' declaration provides screenshots from the Wayback Machine showing the registration pages to sign up via these methods during this period. *Id.* ¶¶ 11–13, Figures 5–7.

Defendants do not, however, provide sufficient evidence as to plaintiff Minichiello, who also began using Honey in 2023. Plaintiffs allege that Minichiello "utilized the Honey browser extension," but not that he created a Honey account. Although defendants' declaration avers that "[a] Honey user cannot redeem rewards unless he or she has created a Honey account," it is not clear whether that has always been the case. Sperling Decl. ¶ 26. Defendants do not offer any evidence that Minichiello created an account or by what method he did so. Defendants therefore do not meet their burden to provide competent evidence that Minichiello was given notice of and agreed to any contract terms.

Plaintiffs argue that defendants' evidence is insufficient to establish what the plaintiffs who signed up during 2016–2018, 2020, and 2023–2024, excluding Minichiello, saw on Honey's

7

registration page because defendants do not provide the "specific account sign-in screens" each plaintiff was shown and instead rely on Wayback Machine screenshots rather than internal records. Dkt. 45, at 8–10. Plaintiffs contend that they "do not recall ever agreeing to any such" terms of service. Dkt. 45, at 1.

Where plaintiffs do not offer any testimony or evidence to rebut a defendant's evidence, however, courts generally reject such challenges to the sufficiency of a defendant's evidence. In *Cordas v. Uber Technologies, Inc.*, for example, another court in this district concluded that there was no genuine dispute of material fact as to whether the plaintiff encountered a screen requiring agreement to terms and conditions when signing up for an Uber account because an Uber engineer submitted a declaration that the page was required to create an account and included a screenshot of what the screen looked like around the time the plaintiff had signed up. 228 F. Supp. 3d 985, 989–90 (N.D. Cal. 2017). The plaintiff, on the other hand, had submitted a declaration with only "his own conclusory allegations that he never received notice of the terms and conditions" on the screen and that Uber's declaration was "false and inadequate." *Id.* Like the court in *Cordas*, this Court concludes that plaintiffs' failure to provide competent evidence directly rebutting defendants' evidence fails to create a genuine issue as to the sign-up process that was presented to those plaintiffs when they created their accounts. *See id.*; *see also Robbins v. Mscripts, LLC*, No. 23-cv-01381-LB, 2023 WL 5723220, *5 (N.D. Cal. Sept. 5, 2023) (explaining that "without any contradicting evidence about what the plaintiff saw, the court is not precluded from concluding as a matter of law that the plaintiff was on notice of mscripts's terms and conditions when he created his account").[3]

In short, defendants fail to meet their burden to provide evidence of what plaintiffs Roskind, White, Fitzgerald, Crowley, Brackney, Regan, and Minichiello saw when signing up for

---

[3] Defendants' use of screenshots from the Wayback Machine also does not undermine the declaration's reliability. *See In re Juul Labs, Inc., Antitrust Litig.*, 555 F. Supp. 3d 932, 948 (N.D. Cal. 2021) (rejecting an attack on the sufficiency of screenshots from the Wayback Machine showing what a page looked like "immediately around those dates" that plaintiffs signed up); *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1192–1195 (W.D. Wash. 2024) ("A party seeking to compel arbitration is not, moreover, required to provide an original screenshot of the account creation process at the precise time a plaintiff created an account.").

Honey. They therefore fail to establish that these plaintiffs received notice of and agreed to any contract terms. For that reason, the motion to compel arbitration is denied as to these plaintiffs.

As to the remaining plaintiffs, the evidence is sufficient for the Court to move to the second step of the analysis—determining whether the sign-up screens encountered by plaintiffs Amenti, Leturgez, Cruz, Freeman, and McDonald in 2016–2018, 2020, and 2023–2024 provided those plaintiffs with reasonably conspicuous notice of contract terms to which they manifested assent. *See Berman*, 30 F.4th at 855.

## II. Defendants meet their burden to establish that the two plaintiffs who signed up for Honey in 2023 and 2024 agreed to arbitrate.

### A. 2016–2018

Amenti and Leturgez, who signed up for Honey via email in 2016 and 2017, respectively, encountered a registration page with a sign-in wrap agreement. The top of the page included a dark blue button that said, "Join with Facebook." Below the button were fields for users to instead enter their email addresses and create a password, followed by an orange button that said, "Join with Email." Sperling Decl. ¶ 5, Figure 1. Below the orange button, in significantly smaller font, the page included text reading, "By joining, I agree to Honey's TOS & Privacy Policy." Further below that statement, in a larger font comparable to the earlier fields, was a statement reading, "Already a Honey member? Log In." The "Log In" was in a blue color, unlike the black or gray font used on the rest of the screen.

The context of the transaction does not weigh heavily one way or another as to whether the sign-up page gave plaintiffs reasonably conspicuous notice. *See Chabolla*, 129 F.4th at 1156 ("Viewed as a whole, the 'context of the transaction' at issue here neither weighs in favor of nor against the notice requirement."). On the one hand, the transaction prompted users to create an account so that Honey could offer users discounts on an ongoing basis. This might indicate that a user "should expect" to be "bound by terms" based on a "continuing relationship" with Honey. *See id.* at 1155. On the other hand, because Honey was a "free browser extension," users might think that they were registering for a one-time download, after which Honey would provide notifications on users' check-out screens without users having to specifically seek out and visit a Honey

United States District Court
Northern District of California

United States District Court
Northern District of California

website or app or otherwise maintain an ongoing relationship with Honey itself. *See Lee v. Plex, Inc.*, 773 F. Supp. 3d 755, 765–66 (N.D. Cal. 2025) (finding the relationship did not put a user on notice to look for additional terms where a user could sign up for services "by clicking just one button and continuing through [a] Facebook account," the service was free and could be cancelled anytime, and the service "did not contemplate any future purchases that would be bound by terms").

Whether or not the context of the transaction might have suggested that users would expect to agree to terms of service, multiple visual aspects of the sign-up page undermine any conclusion that plaintiffs received reasonably conspicuous notice of Honey's terms of service, or "TOS." The text stating "By joining, I agree to Honey's TOS & Privacy Policy" was of a size sufficiently smaller than the text on the rest of the screen that many users would likely have had to squint to read it. The small font size was exacerbated by the color of the text, which was light gray against a white background and in contrast to the two large and colorful buttons on the screen. *See Lee*, 773 F. Supp. 3d at 766 ("[T]he notice is presented in small gray font…. Although it is legible, it is far less prominent than the colorful buttons that the user must click to create an account.").

Moreover, the sign-up page told users that by joining, they agreed to Honey's "TOS." TOS purportedly stood for "terms of service," although that was not made clear anywhere on the page itself. Although defendants argue that the Court can surmise, in this technological age, that a reasonable user would understand TOS to mean terms of service, the Court cannot conclude that a reasonable user in 2016 or 2017 would have known what TOS meant. Honey's use of the acronym TOS undermined any intent by Honey "to capture the [reasonable] user's attention and secure her assent." *See Berman*, 30 F.4th at 857 (citation omitted); *cf. Ghazizadeh*, 737 F. Supp. 3d at 926 (discussing the court's conclusion in *Sellers v. JustAnswer LLC*, 73 Cal. App. 5th 444 (Cal. Ct. App. 2021) "that unless the user was particularly savvy, it was unlikely they would recognize the notice statement"). Even if a reasonable user might have understood TOS to mean terms of service, Honey's use of the acronym required an extra mental step for a user moving quickly through the sign-up page. As a result, even if on notice, a reasonable user might not have immediately understood the import of what they were agreeing to so as to unambiguously

10

manifest assent to the terms. *See Berman*, 30 F.4th at 856.

To be certain, various aspects of the page support Honey's contention that Amenti and Leturgez received reasonably conspicuous notice. In particular, the screen was visually uncluttered, the text containing notice of the terms was directly below the "Join" button, and the terms "TOS" and "Privacy Policy" were underlined to seemingly indicate hyperlinks. *See Chabolla*, 129 F.4th at 1157 (considering "the notice's distance from relevant action items" and "its placement outside of the user's natural flow"); *Colgate v. JUUL Labs, Inc.*, 402 F. Supp. 3d 728, 764–66 (N.D. Cal. 2019) (considering whether hyperlinks were differentiated by underlining or color). Nonetheless, the very small and faded nature of the text did not render the hyperlinks "readily apparent." *See Berman*, 30 F.4th at 856–57 (concluding notice was not conspicuous where text was "printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye"). The aspects favoring Honey thus do not outweigh the many other features of the page that preclude the Court from finding that Amenti and Leturgez received reasonably conspicuous notice of Honey's terms of service. Because they did not receive such notice, they did not agree to the terms and enter a contract with Honey upon the creation of their accounts. Defendants' motion to compel arbitration of their claims is therefore denied.

### B.    2020

Cruz, who signed up for Honey via Google in 2020, encountered a registration page with a click-wrap agreement. The page included a stack of buttons listing different methods to join, including "Join with Google." Sperling Decl. ¶ 8, Figure 3. Above the stack of buttons were two statements with check boxes next to them. The first statement read, "By joining, I agree to Honey's TOS and Privacy. Protected by reCAPTCHA and Google's Privacy and Terms." The second statement read, "Receive news and offers from Honey by email. You can change your communication preferences in your Honey account at any time."

Whether or not this page provided users with reasonably conspicuous notice of Honey's terms of service, defendants fail to meet their burden to establish that users encountering this screen unambiguously manifested their assent to the terms. *See Berman*, 30 F.4th at 856.

11

Defendants' declaration states, "The Wayback Machine reflects that in 2020, a user would affirmatively check a box to agree to the Terms of Service." Sperling Decl. ¶ 8. Nowhere does the declaration aver that a user *had* to check the box to continue signing up for Honey. Defendants ask the Court to recognize that it is "self-evident" that a user would have had to check the box. But where the Court must draw all inferences in favor of the non-moving party, it cannot conclude that a user was required to check the box and indicate their agreement to Honey's terms rather than that it was merely optional for a user to do so. *See Sanford*, 483 F.3d at 963. This is particularly true given that the box next to the second statement, through which users could choose to "[r]eceive news and offers from Honey by email," was most likely optional. Nothing in the text of the page states that checking one of the boxes is mandatory while checking the other is not, and in the absence of evidence specifically establishing that users were required to check the first box, the Court cannot conclude that defendants have satisfied their burden to produce evidence of Cruz's unambiguous assent to Honey's terms of service.

Defendants' motion to compel arbitration of Cruz's claims is therefore denied.[4]

### C.    2023–2024

Plaintiffs Freeman and McDonald, who signed up for Honey in 2023 and 2024 via email and PayPal, respectively, encountered registration pages with a clickwrap agreement. Sperling Decl. ¶¶ 12–13, Figures 6–7. At least half of each of the pages was visually dedicated to a notice that included a checkbox and a button below that said "Agree & Complete Sign Up":

---

[4] Defendants' motion for leave to file supplemental declaration, Dkt. 51, is denied. The proposed supplemental declaration only addresses whether users were required to check a box on the sign-up page after February 2021 and thus would not change the Court's analysis of Cruz's assent. Nor does it remedy defendants' failure to provide competent evidence of the sign-up process that was presented to Brackney and Regan when they created their accounts in 2021 and 2022.

United States District Court
Northern District of California

United States District Court
Northern District of California

These pages provided users with reasonably conspicuous notice of Honey's terms of service. First, the notice was placed above the button to sign up and in the "user's natural flow." *See Chabolla*, 129 F.4th at 1157. Second, although the text was relatively small and gray against a white background, the surrounding text was not much larger and was the same gray or black. The pages thus did not distract or draw the user's eye away from the notice. *See id.* Third, the hyperlinks are in a slightly different color than the rest of the notice and are underlined to indicate their presence to a reasonable user. *See Singh*, 797 F. Supp. 3d at 1048. Although the terms of service are mentioned in the fourth line of the notice, its placement is not fatal to its otherwise conspicuous disclosure; the first line of the notice indicates that users "agree to the following terms," and the button to complete sign-up says, "Agree." As discussed above, the context of the transaction does not weigh heavily for or against the conspicuousness of the terms of service. Taken together, then, the Court finds the terms of service were reasonably conspicuous at the time Freeman and McDonald signed up for Honey.

Freeman and McDonald also unambiguously assented to the terms of service when they moved through the sign-up flow. The pages "explicitly advised" users "that the act of clicking will constitute assent to the terms and conditions." *See Berman*, 30 F.4th at 857. Although defendants' declaration again fails to state whether users had to click the checkbox next to the notice to proceed, the omission is not dispositive here; the button to complete sign-up itself indicated that the user "Agree[d]" to the text above. Although plaintiffs argue that a reasonable user would not have known what they were agreeing to because the pages confusingly provided only one

United States District Court
Northern District of California

checkbox to agree to multiple statements and a user might have thought they were only checking the box to agree that they were over the age of 18, that is not the most natural interpretation of the notice's language. Again, the first line of the notice states that users agree to the "following terms," signaling that multiple terms are included in the notice and correspond to the checkbox. And even if a user might not have understood that the checkbox referred to all of the terms within the notice, the "Agree" in the text of the button provided a further backstop.

Accordingly, Freeman and McDonald received reasonably conspicuous notice of Honey's terms of service when signing up for accounts, and they manifested their assent to those terms. Defendants thus meet their burden of establishing that Freeman and McDonald entered into a contract governed by those terms, including the agreement to arbitrate.

III.    **The agreement's delegation clause requires the arbitrator to determine whether Freeman and McDonald's claims are arbitrable.**

Plaintiffs argue that even if Freeman and McDonald entered into an arbitration agreement, that agreement is void and unconscionable. Defendants contend, however, that the arbitrator must decide validity and unconscionability because the arbitration provision includes a delegation clause.

When plaintiffs Freeman and McDonald signed up for Honey accounts and agreed to the terms of service, the terms included an arbitration provision that read, in relevant part, "You agree that all disputes between you and us … with regard to your relationship with us, including without limitation disputes related to these terms of service … will be resolved by binding, individual arbitration under the American Arbitration Association's rules for arbitration of consumer-related disputes … ." Sperling Decl., Ex. 2 at 4 & Ex. 3 at 11. Plaintiffs do not dispute that the incorporation of the AAA consumer disputes rules in the arbitration provision through the language above was a clear and unmistakable agreement to delegate questions of arbitrability—including validity and enforceability—to the arbitrator. They concede, as a result, that the arbitrator must decide whether the terms of service and arbitration provision are void or unconscionable. The Court must enforce that delegation agreement and permit Freeman and McDonald to present their arbitrability arguments to the arbitrator rather than the Court.

14

**CONCLUSION**

For the foregoing reasons, Defendants' motion to compel arbitration is denied as to plaintiffs Roskind, White, Fitzgerald, Crowley, Brackney, Regan, Minichiello, Amenti, Leturgez, and Cruz, and granted as to plaintiffs Freeman and McDonald.

**IT IS SO ORDERED.**

Dated: February 23, 2026

P. Casey Pitts
United States District Judge

15